UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND BLAKE,

    Plaintiff,

v.

    Case No. 03-74097

    Honorable Nancy G. Edmunds

COUNTY OF LIVINGSTON, ET AL.,

    Defendants.

_____/

**ORDER:
GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [108] & [111],
and DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED
COMPLAINT [110]**

Plaintiff brings this lawsuit based on 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights in connection with his arrest for stalking in the fall of 2001. Now before the Court are Defendants' Motions for Summary Judgment and Plaintiff's Motion for Leave to File Third Amended Complaint. For the reasons discussed below, the Court GRANTS Defendants' Motions and DENIES Plaintiff's Motion.

**I.   Background**

On Friday, October 12, 2001, Plaintiff went on a date with a woman named Nancy Bailey, whom he had met through an online dating service called "Matchmaker." The two apparently had a lovely dinner at Chili's in Ann Arbor, Michigan, and got along well.

At some point during the date, Ms. Bailey, an artist, gave Plaintiff a flyer depicting a watercolor she had painted of an adorable German Shepherd puppy. The flyer includes a short profile of Ms. Bailey, as well as the telephone number, email address, web address,

and mailing address for her studio, "Foxbrush Art Studio," in Gregory, Michigan. (Doc. 116 Ex. 3.) This information pertains not only to Ms. Bailey's art studio, but also to her home, because she lives and works at the same location. Plaintiff states that Ms. Bailey told him that he could "stop by anytime. Just call first." (Doc. 108 Ex. 1 at 202.)

At the end of the night, Plaintiff admitted to Ms. Bailey that another woman on the Matchmaker service, whom he identified at that time as "Shamalama" but who was actually named Siema or Salima Rahaman, had been defaming him and calling him a "stalker" to others in the Matchmaker online community. Plaintiff admitted that Ms. Rahaman's descriptions of his behavior made him sound "stalky." (*Id.* at 284-86.)

The following morning, Plaintiff was using the Matchmaker chat room when he witnessed Ms. Bailey communicating online with Ms. Rahaman. (Doc. 116 at 1.)[1] Perhaps fearful that Ms. Rahaman was discussing Plaintiff's online antics, Plaintiff sent an email to Ms. Bailey on Saturday evening. He explained, "I met Siema . . . and she was simply incredible to me. I guess she mistook my efforts as stalking, but she never once told me to get lost. She just started ignoring me." (*Id.* Ex. 2.) Plaintiff also admitted the following:

> I am not a good liar. I know you are too perceptive for my trivial efforts. Ignoring me online was tough for me. I will confess and clear my conscious [sic]. I am still married and I have an 8 month old daughter. It doesn't matter what the circumstances are, but I will tell you so that you don't think that I was trying to take advantage of you. I wouldn't do that to anyone.

(*Id.*) Plaintiff went on in the email to explain his tumultuous family situation and to describe his low self esteem, which he said led him to Matchmaker: "I felt trapped and began looking into [sic] the personals." He concluded by stating, "I don't blame you for hating me for this.

---

[1] Plaintiff fails to cite evidence for a number of his factual assertions. Where they are immaterial and undisputed, citations are to Plaintiff's Brief.

. . . I have deleted my [Matchmaker] profile and won't call you again. I am sorry that I did not meet up to your expectations." (*Id.*) Plaintiff also called Ms. Bailey and left two messages on her voicemail Saturday evening. The first time, Plaintiff simply said hello and rambled for a moment before hanging up. A few minutes later, Plaintiff called back to ask if Ms. Bailey might like to go to a late movie. (Doc. 121 Ex. 1.)

The following day, Ms. Bailey responded to Plaintiff's email and telephone calls with what she thought was a gentle let down:

> Hi Ray,
>
> Obviously I don't think it's appropriate for us to have further contact, but I wanted to thank you for your candor. You were correct in that I sensed something was not right. . . .
>
> Not that my opinion matters . . . , but I think you were smart to sign off [Matchmaker]. . . . A man can be many things, but when he has a child, what he is most of all is a dad.
>
> Best of luck to you and your family!
>
> Nancy

(Doc. 116 at Ex. 3.)

Undeterred, Plaintiff responded on Sunday with an email stating that he wished to remain friends with Ms. Bailey: "All I can ask is that you leave a friendship option open. Please? . . and you are not obligated to reply to this. Sometimes when I write, I feel much better. It is very therapeutical." (Doc. 108 Ex. 4.)

Then, on Monday, October 15, Plaintiff placed several telephone calls to Ms. Bailey. (*Id.* Ex. 1 at 287; Doc. 121 Ex. 1.) In fact, he left six messages on Ms. Bailey's voicemail:

9:57 am:   Ok, this is, I'm going to try this again. . . .

| | |
|---|---|
| 9:59 am: | I do appreciate your email uh and . . . if you do ever want to go out uh, you know, maybe you can look at me as uh in between divorces or something, that's pretty tacky. . . . |
| 11:45 am: | Hey Nance, this is Ray, are you around? . . . [T]alk to me, please. . . . |
| 11:53 am: | Hey, it's Ray again. I think you're experiencing just a touch of my passionate side, uh, maybe too much. . . . |
| 11:54 am:[2] | I think, um, I don't know. Uh, uh, I think [I] want to talk to you, um, well, I wouldn't be calling if I didn't, but uh. I don't know where Gregory is, I'm gonna head up there to the restaurant tonight at 7. I wanna see, I wanna see ya'. If you're not there, you know, that's fine. I know you're a nice person, you don't like to tell someone off or tell them goodbye, but um. You know, I, I, this is going to sound terrible, but there's nothing going on between my wife and that sounds, that sounds absolutely ridiculous, but. . . . [B]ut um, please, I'll be there at 7. I don't know where this restaurant is, I don't even know if there is a restaurant there. . . . I'm gonna go there tonight and find a restaurant. If there's one there, then there's one there. But uh meet me give me a chance, that's all I ask. Um, okay? [A]nd if you're not there, this is the last time I'll call. |
| 5:47 pm: | Nance, this is Ray. I just printed out this Gregory information map on mapquest . . . . I don't know how I'm gonna find this place. . . . [B]ut anyways, I'm going to try. [A]nd uh it's 5:50. If I'm there in an hour, I'm gonna try. [S]o if you're not there at 7 uh maybe I'll get imaginative. Talk to you then. |

(Doc. 121 Ex. 1.)

Ms. Bailey, perhaps not surprisingly, was afraid for her safety. She lived in an isolated, rural location, and had given Plaintiff her home address on the art flyer. She contacted a friend of hers named Jonathon Shelden, who states,

> Nancy contacts me about 10:30 am frantic and obviously in a bad condition. She was shaking on the phone by her trembling voice. She called me and

---

[2] As to the 11:54 message, the transcript provided by Defendants states, "(Sounding very perturbed)."

4

> wanted to get me over there to stay with her because she had received at least 8 phone messages from Ray. Ray was on his way. And threatened on the answering machine that if Nancy did not meet her at the restaurant in Gregory at 7pm . . . he would be forced to "become inventive."
>
> Nancy and I both concurred it would be best if she were to leave the house at once and go do chores. And I would be over before 6 pm on her return to her house.

(*Id.* Ex. 2.)

At approximately 7:10 pm, Ms. Bailey called 911. (Doc. 108 Ex. 6.) A few moments later, Unadilla Township Police Officer Richard Knieper was dispatched to Ms. Bailey's home to respond to a stalking complaint. Officer Knieper arrived at approximately 7:15 pm. (*Id.*; Doc. 108 Ex. 7 at 25-26.)

Inside the home, Ms. Bailey and Mr. Shelden showed Officer Knieper Plaintiff's emails, played Plaintiff's voicemail messages, and generally explained the situation. (Doc. 108 Ex. 7 at 58, 63, 66-68.) Officer Knieper knew that Mr. Shelden was there because Ms. Bailey "was in fear of her safety." (*Id.* at 48.) Officer Knieper was also concerned, particularly on account of Plaintiff's final voicemail message: "What concerned me about the messages was in the last one he said something to the effect that if she wasn't at the restaurant when he got there that he would have to get inventive . . . ." (*Id.* at 70.)

After about forty-five minutes, Officer Knieper left Ms. Bailey's home. He planned to go to the restaurant in Gregory, find Plaintiff, and tell Plaintiff to leave Ms. Bailey alone. (*Id.* at 73-74.) Just as Officer Knieper was stepping outside, however, Plaintiff pulled into the driveway. Officer Knieper recognized Plaintiff from a picture that Ms. Bailey had shown him. (*Id.* at 79.) Officer Knieper states, "At that point, the complaint had escalated some because he had showed up." (*Id.* at 83.)

Officer Knieper asked Plaintiff to get out of his vehicle and proceeded to pat Plaintiff down for weapons. He then asked Plaintiff to sit in the rear of the patrol car and asked for permission to search Plaintiff's vehicle. Plaintiff cooperated with Officer Knieper and granted him permission to search the vehicle. (*Id.* at 81-84.) Plaintiff states,

> [Officer Knieper] asked me: Do I have any drugs or weapons in the vehicle. And I said: No. He says: Well, do you mind if I look. I was puzzled and I was--I more or less stuttered. I didn't know what to do. That's when he said: Well, if you don't we'll get a warrant to look or warrant to search. I was concerned into thinking what is going on here. I have done nothing wrong. Go ahead and I guess. I don't have any drugs or weapons in there. So he went to look for drugs or weapons. I gave him permission.

(Doc. 108 Ex. 1 at 250.)[3] Officer Knieper's recollection is somewhat different; he states that Plaintiff consented to a general search of the vehicle, rather than simply for drugs or weapons. (*Id.* Ex. 7 at 84.)

Inside Plaintiff's vehicle was a black bag. Protruding from this bag,[4] Officer Knieper discovered a stack of papers relating the names, email addresses, maps, and other personal information of several women. (*Id.* at 85-88.) He states that Plaintiff had information on "somewhere[] between like 20 and maybe 50" different people. "There was

---

[3]Plaintiff gives a similar account in the documentary he has written about this experience, which he incorporates here, entitled, "Internet Dating, *Double Trouble!*":

> He asked me if it was okay to search the Jeep for drugs or weapons and I looked at him confused without saying anything. He raised his voice and said if I refused, he'd just get a warrant to search the vehicle and it would look suspicious if I did not comply with his request to search it now. I told him I had no drugs on me or in my vehicle, and if he had to look, I had nothing to hide.

(Doc. 116 Ex. 1 at 3.)

[4]Plaintiff states in his brief that the profiles "were paper clipped and contained within envelopes, while in a zippered, black workbag." (Doc. 116 at 16.) He points to no evidence to support this assertion, however.

6

a substantial amount of information on people." (*Id.* at 88.) Officer Knieper removed these documents from the bag and confiscated them.

Officer Knieper contacted the on-call prosecutor, William J. Vailleincourt, "to see if Mr. Vailleincourt felt that I had enough probable cause to obtain a warrant":

> From my police report, I had advised him that, you know, Mr. Blake had been contacting Ms. Bailey via the Internet, also by phone, calling eight times, emails, leaving the messages on the answering machine, that they were supposed to meet at the restaurant. It's not here in the police report, but I'm sure I told him of the profiles or correspondence that I found in the front seat of the car.

(*Id.* at 100-01.) Officer Knieper states that Mr. Vailleincourt told him that there was sufficient probable cause to obtain a warrant for Plaintiff's arrest. (*Id.*)

Mr. Vailleincourt gives a slightly different account, stating that while he sometimes provides police officers with legal advice, "in a case where the question is do I have probable cause to arrest for whatever or do I have probable cause to arrest, the answer is always that's your call, not mine, talk to your sergeant or your chief because that's your function." (Doc. 111 Ex. 4 at 45.)

After his conversation with Mr. Vailleincourt, Officer Knieper arrested Plaintiff for stalking. (Doc. 108 Ex. 7 at 137.) He transported Plaintiff to the Unadilla Township Police Department. There, Plaintiff waived his *Miranda* rights and submitted to questioning by Officer Knieper and Lieutenant Michael Shegan. (*Id.* at 113; *Id.* Ex. 1 at 176.) Plaintiff also consented to allowing the Unadilla Township Police Department to remove his home and work computers for investigation, which they did. Plaintiff's handwritten and signed consent form reads as follows:

> I, Raymond Blake, give Unadilla Township Police department permission to remove two computers for forensic inspection pertaining to the investigation

>of Nancy Bailey. One Located at 3874 Trade Center drive, Ann Arbor, MI 48108 and one located at my wife's residence in Ypsilanti Twp, MI on Golfside Rd apt #208, which is also my address at present.

(*Id.* Ex. 8.)

Plaintiff states that he signed this consent form because the officers promised to release him if the computers contained helpful information. Plaintiff states that the officers assured him, "If you are telling us the truth, you got that Saturday email [from Ms. Bailey saying that she had a nice time on Friday], we'll let you go." (Doc. 108 Ex. 1 at 172.)[5] The officers took Plaintiff to his home and to his office, where they confiscated Plaintiff's personal and business computers. No search of the computers ever took place, however, and the charges of stalking were not pursued. (*Id.* Ex. 7 at 125-26.)

Plaintiff was transported to the Livingston County Jail until his arraignment on October 16, 2001, when he was released on bond. Plaintiff eventually pled no contest to criminal charges of trespassing and disorderly behavior. (*Id.* Ex. 1 at 138.)

Unadilla Township Police Chief James R. Lyttle was not involved in the investigation or arrest of Plaintiff. Nor was he even aware of his subordinates' conduct in the investigation or arrest of Plaintiff. (*Id.* Ex. 10, 11.)

On October 10, 2003, Plaintiff filed this lawsuit against numerous defendants, including judges, prosecuting attorneys, probation officers, police officers, Livingston County, and Unadilla Township.

---

[5]In "Internet Dating, *Double Trouble!*", Plaintiff states, "I wrote up the consent agreement, but before I signed it, I wanted them to promise that they would look at the computers when we got back here and if what I was telling them were confirmed, they would give me back my computers and drop the stalking charge. They agreed and I signed the consent." (Doc. 116 Ex. 21 at 15.)

8

On March 3, 2005, this Court granted in part and denied in part the defendants' motions for summary judgment. The Court dismissed most of Plaintiff's claims and all but four of the defendants, with the exception of the following, which are now before the Court.

As to the Unadilla Township Police Department Defendants, Officer Knieper, Lieutenant Shegan, and Chief Lyttle,[6] Plaintiff pursues claims of unlawful arrest (Knieper only), unlawful search of Plaintiff's vehicle, home, and business, unlawful seizure of Plaintiff's personal papers and mail, and unlawful suppression of exculpatory evidence (Shegan only). As to Defendant Vailleincourt, Plaintiff pursues a claim of unlawful arrest, based on Vailleincourt's alleged legal advice to Officer Knieper.

## II.   Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.

---

[6]Plaintiff's theory as to Chief Lyttle is supervisory liability, rather than direct liability.

9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the Court must "construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Id.*  The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice.  Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Discussion

#### A. Unlawful Arrest

The first issue before the Court is whether Plaintiff's arrest was unlawful in violation of the Fourth Amendment, and therefore sufficient to support a claim under 42 U.S.C. § 1983.

The viability of Plaintiff's claim depends on whether Officer Knieper had probable cause to arrest Plaintiff.  United States Supreme Court precedent instructs that an objective test applies:

> Whether [an] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it--whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

*Beck v. Ohio*, 379 U.S. 89, 91 (1964).  *See also McCurdy v. Montgomery County*, 240 F.3d 512, 517 (6th Cir. 2001).

The offense at issue here is stalking.[7]  Michigan law defines "stalking" as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested."  Mich. Comp. L. 750.411h(1).  A "course of conduct" means two or more "separate noncontinuous acts evidencing a continuity of purpose." *Id.* "Emotional distress" is defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling."  *Id.* "Harassment" includes, but is not limited to, "repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress.  Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose."  *Id.* And "unconsented contact" means "any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued."  Unconsented contact includes "sending . . . electronic communications," "contacting . . . by telephone," and "appearing at [a person's] . . . residence."  *Id.*

In this case, the facts known to Officer Knieper support a finding of probable cause to arrest Plaintiff. Officer Knieper was advised by dispatch that Ms. Bailey was complaining of "stalking."  When he arrived at Ms. Bailey's home, he heard eight voicemail messages from Defendant, the last of which threatened to "get imaginitive" if Ms. Bailey did not meet

---

[7]While Plaintiff was not convicted of stalking, his arrest was based upon that offense.

11

Plaintiff for dinner. Officer Kneiper also saw several email correspondences, one of which very clearly demonstrated Ms. Bailey's desire not to have any contact with Plaintiff: "I don't think it's appropriate for us to have further contact." While Plaintiff apparently refuses to see this as rejection, Officer Kneiper reasonably interpreted it as such. Finally, and most importantly, Plaintiff showed up at Ms. Bailey's home. As Officer Kneiper correctly recognized, at that point "the complaint had escalated some."

Confronted with these facts, there was ample probable cause to arrest Plaintiff for stalking, and Plaintiff's arrest was lawful. Plaintiff has produced no evidence to support a reasonable jury verdict to the contrary. The Court therefore DISMISSES Plaintiff's claim of unlawful arrest as to Defendants Officer Kneiper, Mr. Vailliencourt, and Chief Lyttle.

### B. Unlawful Search of Plaintiff's Vehicle, Home, and Office

In addition to his wrongful arrest claim, Plaintiff contends that the search of his vehicle, home, and office violated the Fourth Amendment prohibition of unreasonable searches and seizures.[8]

Prior to placing Plaintiff officially under arrest, Officer Knieper asked Plaintiff to sit in the rear of his patrol vehicle and asked for permission to search Plaintiff's vehicle. Plaintiff consented to the search, with the apparent understanding that Officer Knieper was only looking for drugs or weapons. Plaintiff did not expressly limit the scope of his consent,

---

[8]Plaintiff captions his arguments as pertaining to an unlawful seizure claim as well, but Plaintiff does not argue that the removal of his collection of profiles, or the removal of his computers, constituted a "meaningful interference with his possessory interests" in those items. *See Fox v. Van Oosterum*, 176 F.3d 342, 350 (6th Cir. 1999) ("For Fourth Amendment purposes a "'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'") (quoting *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992)). Thus, Plaintiff's claims are treated only as unlawful search claims.

however. Officer Knieper then searched Plaintiff's vehicle. Protruding from a bag in Plaintiff's vehicle, Officer Knieper found several profiles, maps, emails, and other information regarding women Plaintiff had apparently met or pursued online. Officer Knieper removed these materials from Plaintiff's vehicle.[9]

Plaintiff pursues two theories as to the search of his vehicle. First, Plaintiff argues that because Officer Knieper threatened to get a warrant to search his car, the consent to search was coerced and therefore invalid. Curiously, Plaintiff relies on *United States v. Long*, 866 F.2d 402 (11th Cir. 1989), despite the fact that the Eleventh Circuit's decision in that case directly contradicts Plaintiff's position here. In *Long*, like here, the defendant (in a criminal case) argued that he consented to the search in part because "the officers threatened that, if necessary, they would return and 'dig the place up.'" *Id.* at 404. The court held that the officers' alleged threat "does not amount to coercion. Long was free to force the agents to obtain a search warrant and, if at that time, he did not want 'his whole place dug up,' Long could have cooperated." *Id.* at 405. The court concluded, as had the district court, that the search was lawful. In this case as well, Officer Knieper's alleged statement that he would get a warrant to search Plaintiff's car did not render Plaintiff's consent invalid. *See United States v. Watson*, 1997 U.S. App. LEXIS 17186, *9 (6th Cir. 1997) ("Notifying a person that a warrant can be obtained does not render consent

---

[9]Plaintiff states in his brief that Officer Knieper also removed from his vehicle "a September 9, 2000 letter from the State of Michigan Attorney General regarding a dispute over a computer . . . ." (Doc. 116 at 16 n.19.) Plaintiff points to no evidence of this alleged seizure, however. In addition, Defendants' brief anticipates that Plaintiff may argue that CDs and floppy disks were removed from his vehicle. (Doc. 108 at 17.) Plaintiff makes no such allegations, and points to no evidence that CDs or floppy disks were removed from his vehicle.

involuntary unless the threat to obtain a warrant is baseless") (citing *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992); *United States v. Talkington*, 843 F.2d 1041, 1049 (7th Cir. 1988); *United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980); *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980)).

Next, Plaintiff argues that the search of his vehicle "exceeded the scope of consent to search for drugs or weapons," apparently in reference to the profiles and information that Officer Knieper found protruding from Plaintiff's bag. "When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness . . . ." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The Court must ask, "what would the typical reasonable person have understood by the exchange between the officer and the suspect." *Id.*; *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004). "As long as an officer has an objectively reasonable belief that the search was within the course of consent, the search is valid." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003) (citing *Jimeno*, 500 U.S. at 251)). Even based on Plaintiff's version of the facts, Officer Knieper was objectively reasonable in believing that Plaintiff's consent was not limited to a search for drugs and weapons. Plaintiff never told Officer Knieper that he may only look for drugs or weapons; rather, by his own admission, he said he "had *nothing* to hide." Thus, the search of Plaintiff's vehicle, including the stack of profiles and personal information that he had collected on various women, was consensual and therefore lawful.

14

Plaintiff's claims that his home and business were unlawfully searched appears to be based solely on Defendants' search of his computers. Plaintiff consented to the removal and search of the computers in a handwritten and signed consent form. Plaintiff now argues, however, that "his consent was based on the false promise that he would be released" if the search of his computers proved that (1) Ms. Bailey had sent an email saying that she enjoyed the Friday evening date, (2) there were not "dozens of emails" from Plaintiff to Ms. Bailey over the weekend, and (3) Ms. Rahaman had said in a chat room that she had moved from her apartment because of a roof leak.[10] Thus, Plaintiff argues that the consent to search his computers was coerced by Defendants' promises of leniency. The problem with Plaintiff's argument, however, is that no search ever took place. Defendants never even powered up the computers, and instead dropped the stalking charges against Plaintiff.

Because the search of Plaintiff's vehicle was consensual and because there was no search of Plaintiff's computers, the Court DISMISSES Plaintiff's claims of unlawful search of his vehicle, home, and office as to Defendants Officer Knieper, Lieutenant Shegan, Mr. Vailliencourt, and Chief Lyttle.

### C. Unlawful Suppression of Exculpatory Evidence

Plaintiff briefly argues that Defendants should be held liable for failing to apprise him and/or the prosecuting officer of exculpatory evidence. Plaintiff relies on *Thompson v. Olson*, 798 F.2d 552 (1st Cir. 1986), in which the First Circuit recognized that upon making an arrest, a police officer may not "close his eyes to all subsequent developments." *Id.* at

---

[10]Presumably, Plaintiff wished to show that Ms. Rahaman had not moved to escape his alleged stalking.

556. Plaintiff fails to mention, however, that the court was discussing common law false imprisonment, rather than a constitutional claim.[11] Plaintiff identifies no deprivation of any constitutional right regarding the alleged "suppression" of evidence; nor does he even identify any evidence "suppressed."[12]

**IV.  Conclusion**

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above and on the record, the Court hereby ORDERS as follows:

1) The Court GRANTS Defendants' Motions for Summary Judgment. Plaintiff's claims against all Defendants are dismissed in their entirety.

2) The Court hereby DENIES Plaintiff's Motion for Leave to File a Third Amended Complaint for the reasons stated in the Court's Order of March 3, 2005 and in Defendants' briefs. Plaintiff fails to identify what "newly discovered documents" supports, or possibly could support, his amended claims.

        s/Nancy G. Edmunds
        Nancy G. Edmunds
        United States District Judge

Dated: April 27, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 27, 2006, by electronic and/or ordinary mail.

        s/Carol A. Hemeyer
        Case Manager

---

[11] The court in *Thompson* briefly discussed 42 U.S.C. § 1983 as to an entirely separate legal theory, finding that the plaintiff had failed to establish a substantive due process claim based on conduct that "shocks the conscience." 798 F.2d 558-59.

[12] Plaintiff appears to recognize that he has no claim under *Brady v. Maryland*, 373 U.S. 83 (1963), since Plaintiff has had access to all of the evidence about which he now complains.