UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND M. BLAKE,

    Plaintiff,

v.

RICHARD J. KNIEPER AND MICHAEL S. SHEGAN,

    Defendants.
                                    /

Case No. 03-74097

Hon. Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [143]**

    Plaintiff Raymond Blake filed this action pursuant to 42 U.S.C. § 1983, alleging deprivation of constitutional rights in connection with his 2001 arrest for stalking and use of a computer to commit a crime. On April 27, 2006, this Court granted Defendants' motion for summary judgment and dismissed the case. (Defs.' Mot., Ex. A.) Blake appealed that decision, and the Sixth Circuit affirmed in part, reversed in part, and remanded the case for this Court to address Blake's claim that Officers Knieper and Shegan unlawfully seized Blake's business computer and two CD-ROMs. (Defs.' Mot, Ex. B, at 5.) This matter comes before the Court on Defendants Shegan and Knieper's motion for summary judgment. For the reasons set forth below, Defendants' motion is GRANTED.

**I.    Background**[1]

---

[1] The Court is familiar with the facts of this case, having ruled on Defendants' previous summary judgment motion. Only the facts relevant to this motion are described below.

On October 12, 2001, Plaintiff Raymond Blake went on a date with Nancy Bailey, whom he had met using an online dating service called Matchmaker. (Defs.' Mot., Ex. A, at 1.) During this date, Bailey gave Blake a flyer about her work as an artist, which included her home address in Gregory, Michigan. (*Id.*) That evening Blake told Bailey that a woman identified as Shamalama was telling others on Matchmaker that he was a stalker. (*Id.*) When he returned from their date, Blake sent Bailey an e-mail thanking her for a nice evening. (Def.'s Mot., Ex. B, at 1.) Bailey responded with an e-mail in which she thanked him for dinner and stated, "[i]t was fun gettin to know ya a little." (Pl.'s Resp., Ex. 3.)

The next day, after suspecting that Bailey was communicating with Shamalama on Matchmaker, Blake sent Bailey an e-mail explaining his prior relationship with Shamalama and confessing to being married and having an eight-month old daughter. (Defs.' Mot., Ex. A, at 2.) He informed Bailey that he had deleted his Matchmaker profile and would not contact her again. (*Id.*) That evening, however, Blake left Bailey two phone messages, a few minutes apart. (*Id.*) In the second message, he invited Bailey to a late movie. (*Id.*)

On October 14, in response to the e-mail and phone messages, Bailey sent Blake an e-mail explaining that she did not think it was appropriate for them to have further contact. (*Id.*) Blake responded that day with an e-mail asking Bailey to "leave a friendship option open." (*Id.*)

On Monday, October 15, Blake left six messages on Bailey's home answering machine. (*Id.*) In the fifth message, Blake informed Bailey that he was going to head to

2

a restaurant in Gregory at 7 pm that evening and asked her to meet him there. (*Id.* at 2-3.)[2]

In his sixth message, left at 5.47 pm, Blake stated:

> Nance, this is Ray. I just printed out this Gregory information map on mapquest . . . I don't know how I'm gonna find this place . . . But anyways, I'm going to try. So if you're not there at 7 uh maybe I'll get imaginative. Talk to you then.

(Defs.' Mot., Ex. A, at 3.) Upon receiving these messages, Bailey, who lived in a rural, isolated, location, was afraid for her safety and called a male friend to come stay with her. (*Id.*)

At approximately 7.10 pm on October 15, 2001, Livingston County 911 received a call from Bailey, requesting police assistance. (Defs.' Mot., Ex. D, at 26-33.) Richard Knieper, an Unadilla Township police officer was dispatched to respond to a complaint of stalking and arrived at Bailey's home at 7.15 pm. (*Id.* at 34.) Bailey explained the situation, showed Knieper Blake's e-mails and a picture of him, and played him the phone messages. (*Id.* at 37, 50.) Knieper decided to meet Blake at the restaurant to warn him not to have any further contact with Bailey. (*Id.* at 51, 54.) But at 8.00 pm, just as Knieper was leaving Bailey's house, Blake pulled into Bailey's driveway. (*Id.* at 54-57.)

Knieper asked Blake to get out of his vehicle, patted him down, and was granted permission to search Blake's car. (Defs.' Mot., Ex. F, at ¶ 4-6.) Before Knieper conducted the search, he handcuffed Blake's hands in front of him and asked Blake to sit in the rear of his patrol car. (Defs.' Mot., Ex. F, at ¶ 4-5.)[3] Knieper found an open black bag on the

---

[2] For a detailed account of Blake's e-mails and phone messages, see Defs.' Mot., Ex. A, at 1-3.

[3] Knieper testified that he did not handcuff Blake until he arrested him at approximately 10.17 pm. (Defs.' Mot., Ex. D, at 91, 107.)

3

front seat of Blake's car containing printed Matchmaker profiles of many women, including Bailey, the flyer Bailey had given Blake on their date, a map to Bailey's home, and two containers of floppy disks and CDs. (Defs.' Mot., Ex. D, at 85-88; Ex. E; Ex. J; Ex. L.)[4] Knieper contacted the on-duty prosecutor for advice regarding whether there was probable cause to issue an arrest warrant. (Defs.' Mot., Ex. D, at 93.) At approximately 10.17 pm, Knieper arrested Blake for stalking, and drove him the 3-4 miles to the Unadilla Township Police Station. (*Id.* at 108.)

At 11.45 pm, Knieper advised Blake of his *Miranda* rights, making sure he understood each one. (Defs.' Mot., Ex. D, at 111, 115-16.) Blake waived his *Miranda* rights orally and in writing. (Pl.'s Mot., Ex. 1.) According to Blake, before waiving his *Miranda* rights, he mentioned that he had an attorney, and one of the officers told him that if he wanted to speak to his attorney he would need to wait until morning. (Defs.' Mot., Ex. C, at 189-91.)[5]

Knieper, along with Officer Michael Shegan, then began questioning Blake in the ten by twelve-foot front lobby of the police station. (Defs.' Mot., Ex. D, at 111, 117-18; Ex. G, at 6.) They had locked the doors to prevent anyone from entering, and Blake was seated with one arm handcuffed to a chair. (Defs.' Mot., Ex. D, at 117-18.) During this questioning, Knieper and Shegan made several allegations, including that Blake sent Bailey dozens of e-mails over the weekend; repeatedly shoved their fingers in his face; and called him a liar. (Defs.' Mot., Ex. C, at 171-72.) Blake testified that this interchange with Knieper followed:

---

[4] Knieper testified that there were profiles of between twenty and fifty women in the car. (Defs.' Mot., Ex. D, at 88.)

[5] Knieper testified that this conversation never occurred. (Defs.' Mot., Ex. D, at 115-16.)

And I said: If they were there, if I sent her dozens of emails over the weekend, they would be on my home computer. If they aren't on there, then I didn't send them. These were verbal allegations made. Also the allegation that she told me off on the date . . . The computer, I felt that I had to give the home computer. There was some other allegations made that the issue of the date. I said: No I received an email from her Saturday morning stating that she had fun on the date.

He said: Well, that's not in my stack here. You're lying to me.

I said: Well, it's on the home computer. So we started talking about the home computer some. I said: Fine. We'll go ahead. If I can prove that to you, can we dispense with this?

He said: Yes. We'll bring the computer back. If you are telling us the truth, you got that Saturday email, we'll let you go. Do you have any other computers?

I said: Well, yes. I have one at my work. Then we got into the business, that I owned a computer company. And that got into a mess. I said: No, I don't want to give you the business computer. It's not even connected to the internet. It's my business computer. I need it to run.

I'm under the impression that this is all going to be dispensed of once my computer is powered up and checked for the exculpatory evidence, because there's a third piece of exculpatory evidence. They started approaching with allegations that I stalked the second woman to the point where she had to move out of her Ypsilanti apartment. I said: No, that's not true. We were friends.

The thought occurred that I even have a chat file where she admitted to me that the roof caved in. That chat file has got to be on there because I saved it. So all of this exculpatory evidence is there.

I said: As far as the Sunday e-mail Donna — when we pick up the home computer — Donna can go ahead and explain to you exactly what my thought — what I conveyed to her of what my thinking was. She was the one that gave me advice. Just wait a day. Let her cool down. She's just angry. She's not a woman who sounds like she doesn't want any contact with you. Give her 24 hours and contact her in the morning on Monday.

\* \* \*

I turned around, told the officers that and they shoved their finger in my face and called me the liar again. I don't believe you. Everything was an "I don't believe" and then they wanted the business computer. I said: No, that is my computer.

> The more I resisted, the more they thought I was hiding something. Then they started threatening me saying I could go to prison for five years for this stupid stuff. Here I'm handcuffed to a chair for six to eight hours during this interrogation; withheld three hours in that stupid patrol car from the time I pulled up there.[6] I had it. You know; I said: Fine.

(Defs.' Mot., Ex. C, at 172-74.) Blake also alleges that the officers "threatened that they would start an investigation with all [his] clients and get search warrants for their computers if [he] didn't comply" with their request to seize his business computer. (Pl.'s Resp., Ex. 2, at 15.)[7] Blake then wrote and signed the following:

> I, Raymond Blake give Unadilla Township Police Department permission to remove two computers for forensic inspection pertaining to the investigation of Nancy Bailey. One located at [his business address] and one located at my wife's residence . . ., which is also my address at present.

(Pl.'s Mot., Ex. 1.) Blake testified as follows in his affidavit:

> I wrote up the consent based on the promise that the computers would be checked for the missing Saturday email from Ms. Bailey about having fun on the date, the chat-file between myself and Rahaman showing she moved from her Ypsilanti apartment because the roof had sprung a leak, and the absence of claimed dozens of emails to Ms. Bailey over that particular weekend, and that they would do so when we arrived back at the Unadilla Township Police Department; . . . I believed that the investigation of my

---

[6] The record suggests that Blake was detained in the patrol car for approximately 2 hours and 17 minutes and then remained at the police station for approximately four hours. (Pl.'s Resp., Ex. 9.) Questioning began after he was read *Miranda* rights at 11.45 pm and ended sometime before Blake left the station with the officers at 2.27 am. (Pl.'s Resp., Ex. 1.) Knieper contends that Blake was questioned for less than an hour before consent to seize the computers was given, while Blake contends that it was longer. (Defs.' Mot., Ex D, at 117.)

[7] The fact of this interchange is disputed. Knieper denies having made any promises to Blake. (Defs.' Mot., Ex. D, at 117.) Shegan does not recall Blake having conditioned seizure of the computers on the officers searching the computers for exculpatory evidence that night. (Defs.' Mot., Ex. H, at 62-63.) Shegan testified that Blake understood that he was not going to be released and would be taken to jail after they picked up the computers, but Shegan could not recall what was said to Blake on the subject. (*Id.* at 73-74.)

6

> computers was for the sole purpose of disproving false claims of Nancy Bailey, and I was clearly under the impression, by a verbal agreement between me and the officers, that if what I said was found to be the truth, then I was to be released, along with my computers.

(Defs.' Mot., Ex. K, at ¶¶9-10.) Blake also writes in "Double Trouble":

> I wrote up the consent agreement, but before I signed it, I wanted them to promise that they would look at the computers when we got back here and if what I was telling them were confirmed, they would give me back my computers and drop the stalking charge. They agreed and I signed the consent.

(Pl.'s Resp., Ex. 2, at 15.)

At approximately 2.27 am, Knieper and Shegan drove Blake, who was handcuffed in the backseat, to his office and home where they picked up his home and business computers. (Pl.'s Resp., Ex 9.) Blake gave the officers directions to his business, and let them in using his keys. (Pl.'s Resp., Ex. 2, at 18.) He remained handcuffed in the patrol car, while they were inside for half an hour. (*Id.*) Shegan placed the business computer in the backseat, and Blake did not believe, at the time, that he had taken anything else from the office. (*Id.*) When the officers returned to the car, they made comments to Blake that suggested that they had also gone to a warehouse, located behind a locked door. (*Id.* at 19.) They then drove to Blake's home, where he directed them to his apartment, let them in using his keys, and directed them to the computer. (*Id.* at 21.) The officers refused Blake's request that they question his wife regarding his claims. (*Id.*) The home computer was also placed in the backseat of the patrol car. (*Id.* at 22.)

The officers then drove Blake directly to the Livingston County Jail where they arrived at 5.41 am on October 16. (Pl.'s Resp., Ex. 9.) Blake was arraigned on charges of misdemeanor stalking and use of a computer to commit a crime and released on bond at

7

3.38 pm that afternoon. (Def.'s Mot. at 6.) The business computer was the main file server for Blake's business, and without which Blake alleges he "couldn't do anything." (Defs.' Mot., Ex. C, at 112.) According to Blake, the data on the work computer had been backed up on two CD-ROMs that he had left sitting next to his business computer, and which were missing when he returned to his office. (*Id.* at 112-13.) On January 16, 2002, the County returned Blake's computers to him but never returned the work CD-ROMs. (Defs.' Mot., Ex C, at 111-13.) The stalking charge was not pursued, and the computers were never searched. (Defs.' Mot, Ex. D, at 125-26.) On March 19, 2002, Blake pled no contest to charges of trespassing and disorderly behavior, was fined $505 and sentenced to two years probation. (Defs.' Mot. at 6.)

On October 10, 2003, Blake filed a Complaint in the United States District Court for the Eastern District of Michigan against several defendants. Following this Court's dismissal of several claims, Plaintiff filed a Second Amended Complaint on April 20, 2005, seeking recovery under 42 U.S.C. § 1983. In Count 4 of his Second Amended Complaint, Blake alleged that his "company's file server/computer was unlawfully seized without a warrant . . . causing great hardship to [him]" and that "Knieper and Shegan unlawfully seized without a warrant, two CDROM's [from his business] . . . causing great hardship to [him]." (Docket Text # 81, at 18-19.) On April 27, 2006, this Court entered summary judgment in favor of defendants, declining to rule on Plaintiff's unlawful seizure claim on the basis that he had failed to prove interference with a possessory interest. (Defs.' Mot., Ex. A, at 6.) On June 16, 2006, Plaintiff filed a notice of appeal. On December 11, 2007, the Sixth Circuit affirmed the grant of summary judgment on all but one claim, holding that this Court erred in "failing to address [Blake's] claim that the seizure of his business computer

8

and CD-ROMs was unlawful." (Defs.' Mot., Ex. B, at 4.)[8] The Sixth Circuit remanded Blake's claim to this Court to determine "whether Blake's consent to the seizure of his business computer was voluntary and encompassed the CD-ROMs." (*Id.*) On October 21, 2008, Defendants Knieper and Shegan moved for summary judgment, asserting qualified immunity.

## II.  Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

---

[8] The Sixth Circuit affirmed this Court's determination that Officer Knieper had probable cause to arrest Blake and that Knieper's search of Blake's car and seizure of the items found therein was lawful. (Defs.' Mot, Ex. B, at 3-4.)

The non-moving party may not rest upon its mere allegations, however, but rather must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

### III. Analysis

Defendants contend that summary judgment is appropriate because (1) Plaintiff consented to the seizure of his business computer; and (2) Plaintiff has failed to present sufficient evidence that Defendants seized his work CD-ROMs.

**A. Seizure of Business Computer**

Qualified immunity "'generally . . . shield[s]'" "'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 602 (6th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This Court employs a two-step qualified immunity analysis, asking whether: (1) "'[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'"; and if so (2) "'whether the right was clearly established . . . in light of the specific context of the case.'" *Walters v. Stafford*, No. 07-4072, 2009 WL 692164, *4 (6th Cir. Mar. 18, 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 377 (2007)).[9]

---

[9] The Sixth Circuit has noted that while this sequential analysis is no longer mandatory after *Pearson v. Callahan*, _U.S._, 129 S.Ct. 808 (2009), it if often "beneficial." *Walters*, 2009 WL 692164, at *4 n.5.

The Fourth Amendment protects citizens against unreasonable searches and seizures, and "absent special circumstances, 'warrantless searches [and seizures] are presumptively unreasonable.'" *Daughenbaugh*, 150 F.3d at 603 (internal citation omitted). A warrantless seizure is permitted when conducted pursuant to voluntary consent. *Illinois v. Rodriguez*, 497 U.S. 177, 183-84 (1990); *Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973). In order to be deemed voluntary, consent must be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992). "'Whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.'" *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988) (quoting *Schneckloth*, 412 U.S. at 227).

In making this determination, this Court looks at several factors, including: "'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999) (internal citation omitted). "[N]o one single factor is determinative of voluntariness." *Jones*, 846 F.2d at 360.

Viewing the facts in the light most favorable to Plaintiff, the factors suggesting Blake's voluntary consent to the seizure of his business computer include: (a) Blake's age, intelligence, and education; (b) that Blake's arrest and detention were lawful, based on probable cause; (c) that Blake was read and waived his *Miranda* rights; (d) that Blake initially suggested that the officers view the contents of his home computer; (e) that Blake

11

wrote and signed a written consent to the seizure of the business computer; and (f) that Blake gave the officers directions to his business and let them in using his key.

On Plaintiff's version of the facts, factors militating against a finding of voluntariness include: (a) Blake's five-hour detention, including what Blake alleges was several hours of questioning, prior to his giving of consent; (b) Blake's presence in a police station, with one arm handcuffed to a chair; (c) the Officer's threat of a five-year term of incarceration; (d) the Officer's threat of obtaining a search warrant to search the computers of Blake's clients; and (e) Officer Knieper's suggestion that the officers would search the computers for the alleged exculpatory evidence and release Blake that night if it were found.

Based on a review of the totality of the circumstances, this Court concludes that Blake has failed to demonstrate the existence of a genuine issue of material fact as to the voluntariness of his consent. While Blake asserts that his consent was the product of coercion, he "'must show more than a subjective belief of coercion, but also some objectively improper action on the part of the police.'" *United States v. Ivy*, 165 F.3d 397, 403-04 (6th Cir. 1998) (quoting *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995)) (consent involuntary because handcuffing suspect's girlfriend to table, taking away their child, and threatening to place child in government custody constituted "objectively improper police action"). In this case, it was Blake who suggested and urged the Officers to search his home computer for exculpatory evidence. That the Officers would only agree to do so if they could also search Blake's business computer does not change the fact that the seizure was at Blake's initial urging. *See United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996) (consent voluntary because it was suspect who suggested police search letter for exculpatory evidence). After signing a written consent to the seizure, Blake

directed the Officers to his business, let them in using his key, and remained silent while they placed the computers in the back of the squad car — all factors suggesting voluntary consent. *See United States v. Johnson*, 109 F. App'x 76, 79 (6th Cir. 2004) (quoting *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)) (noting that "'the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure'"); *Shlater*, 85 F.3d at 1256 (consent voluntary when suspect accompanied police to his home to seize evidence and voiced no objection to search).

Blake argues that his consent was induced by fraud because Defendants led him to believe that they would search his home computer for exculpatory evidence that night. This is not, however, an instance in which officers achieved consent by "outright fraud." *Hadley v. Williams*, 368 F.3d 747, 748-49 (7th Cir. 2004) (consent to search involuntary when given only after officers falsely claimed that they had a warrant); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (same). Rather, the Officers' suggestion that they were amenable to Blake's offer to show them the exculpatory evidence on his home computer is "the sort of minor fraud that the cases allow." *See United States v. Rutledge*, 900 F.2d 1127, 1130-31 (7th Cir. 1990) (noting that consent would be voluntary even if officer had promised suspect "a *net* benefit" from cooperating when "it is unlikely that the officer intended to keep [the promise]"); *see also id.* at 1131 (noting that "the law permits the police to pressure and cajole, conceal material facts, and actively mislead — all up to limits not exceeded here"). Moreover, "[t]here is no indication in the record that . . . [Blake] was mentally deficient, or unable in the face of a custodial arrest to exercise a free choice." *United States v. Watson*, 423 U.S. 411, 424 (1976). The key inquiry is whether Blake's "will ha[d] been overborne and his capacity for self-determination critically impaired" by the

13

Officers' statements. *Schneckloth*, 412 U.S. at 225. The totality of the circumstances do not suggest that this was the case.

Finally, that Plaintiff was in custody, had one arm in handcuffs, and had been detained for several hours does not vitiate the voluntariness of his consent. *See e.g., Watson*, 423 U.S. at 424 (noting that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"); *United States v. Navedo-Colon*, 996 F.2d 1337, 1338-39 (1st Cir. 1993) (consent voluntary even though given while suspect detained in nine-by-nine foot room with one hand handcuffed to chair); *United States v. Arango-Correa*, 851 F.2d 54, 57-58 (2d Cir. 1988) (consent voluntary even though *Mirandized* suspect had been questioned for five hours and strip searched); *United States v. Choate*, No. 98-6272, 2000 WL 263348, *5 (6th Cir. Mar. 2, 2000) (noting that handcuffed suspects may give voluntary consent).[10]

### B. Seizure of Work CD-ROMs

Defendants argue that summary judgment is appropriate on Plaintiff's claim of unlawful seizure of his work CD-ROMs because Blake has failed to present sufficient evidence that the officers actually seized the CD-ROMs from Blake's office. (Defs.' Reply Br. at 2-4.)[11] Even if Blake had presented sufficient evidence of the seizure of the CD-

---

[10] Because the Court finds that no constitutional violation occurred, it need not address the second prong of the qualified immunity analysis.

[11] Based on a review of the entire record, the Court concludes that Blake has not presented sufficient evidence such that a reasonable juror could find that the Officers seized the work CD-ROMs. In deposition testimony, Shegan denies having seized the CD-ROMs from Blake's business. (Defs.' Mot., Ex. H, at 77.) The receipt of property turned over to the prosecutor lists two containers with floppy disks and CDs, but Knieper has submitted an affidavit stating that these CDs were taken during the consensual search of Blake's vehicle. (Defs.' Mot., Ex. L.) In response, Blake offers the following evidence in

14

ROMs, summary judgment would still be appropriate on this claim.  This is because Blake's consent to the seizure of his business computer encompassed the seizure of the two backup CD-ROMs located next to the computer.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida*

---

support of his allegation that Knieper and Shegan took the CD-ROMs from his office:

1. Blake testified that prior to the night of October 15, 2001, he had downloaded the data from his business computer onto two CD-ROMs and placed them in a step rack next to his business computer;

2. Blake testified that when he returned to his office after the search, the CD-ROMs were missing.  (Defs.' Mot., Ex. C, at 113.)  Blake did not investigate the alleged disappearance of the work CD-ROMs;

3. Police Chief Lyttle was quoted in a news article that also reported that Blake was found with computer profiles of about 30 women, and Blake testified that he had profiles of 30-40 women on the two CD-ROMs at his office.  (Pl.'s Resp., Ex. 6; Defs.' Mot., Ex. C, at 112.);

4. Knieper and Shegan were in Blake's office for at least half an hour, while he was handcuffed in the patrol car.  (Pl.'s Resp., Ex. 2, at 18.); and

5. Blake testified that the only CDs in his vehicle were a collection of Windows operating systems.  (Defs.' Mot., Ex. C, at 127.)

Plaintiff's mere allegation that the CD-ROMs were taken, in the face of contrary testimony and evidence, does not suffice.  *Cf. Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (noting that "the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed th[e] [alleged] acts").  Chief Lyttle's quote that Blake had computer profiles of 30 women does not provide the requisite evidence that the CD-ROMs were seized since Officer Knieper testified that he had found printouts of profiles of 30 to 50 women in Blake's car.  (Defs.' Mot., Ex. D, at 88.)

*v. Jimeno*, 500 U.S. 248, 251 (1991). "The scope of a search is generally defined by its expressed object." *Id.*

It was objectively reasonable for Knieper and Shegan to conclude that Blake's consent to the seizure of his business computer encompassed the seizure of the two data CD-ROMs sitting next to it. *Cf. United States v. Herndon*, 501 F.3d 683, 690 (6th Cir. 2007) (terms of probation providing consent to monitoring of defendant's computer extended to search of external hard drive because "the term 'computer' is commonly understood to include the collection of components involved in a computer's operation"). Moreover, given the expressed object of Knieper and Shegan's search — data stored on Blake's business computer — it was objectively reasonable for the officers to conclude that Blake's consent included the seizure of the corresponding data CD-ROMs. *See, e.g.*, *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004) (search of gas tank did not exceed scope of suspect's consent to search vehicle for contraband, which can be stored in gas tanks); *United States v. Gant*, 112 F.3d 239, 243 (6th Cir. 1997) (opening of container within luggage did not exceed scope of suspect's consent to search luggage, especially where suspect is told that officers are searching for drugs that are often stored in such containers); *cf. United States v. Miller*, 450 F.Supp.2d 1321, 1334 (M.D. Fla. 2006) (consent was not limited to removal of computer tower where object of search was child pornography; suspect had admitted that external storage device contained downloaded images; and officer's explanation of computer-search process alluded to external hard drive).

**IV. Conclusion**

      For the foregoing reasons, Defendants' motion is GRANTED.

                s/Nancy G. Edmunds
                Nancy G. Edmunds
                United States District Judge

Dated: June 16, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 16, 2009, by electronic and/or ordinary mail.

                s/Carol A. Hemeyer
                Case Manager